Filed 3/28/22  P. v. Chavez-Estrella CA1/4

Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DANIEL CHAVEZ-ESTRELLA, Defendant and Appellant. | A158809 (Alameda County Super. Ct. No. 18-CR-012587) |

Daniel Chavez-Estrella was convicted of carjacking after a jury trial in which the court found the victim, Maria Holguin (Holguin), unavailable and admitted her preliminary hearing testimony. On appeal to this court he challenged that decision, Holguin's identification of Chavez-Estrella at a show-up and in court, the eyewitness jury instruction (CALCRIM No. 315) and the denial of his suppression and *Romero* motions. We affirmed.

Chavez-Estrella petitioned for Supreme Court review, reasserting his challenges to his conviction and asserting he was entitled to remand for resentencing pursuant to new sentencing provisions. The Court granted review and transferred the case to

1

this court with directions to vacate our decision and to reconsider the cause in light of Senate Bill No. 567 (Stats. 2021, ch. 731 (Senate Bill 567)) and Assembly Bill No. 124 (Stats. 2021, ch. 695 (Assembly Bill 124)). We do so now.

## BACKGROUND

### The Carjacking

After cleaning a Berkeley storage facility with her son on the afternoon of July 23, 2018, Holguin entered and started her 2003 gray Saab, and exited the car to await her son. A man—later identified as Chavez-Estrella—approached Holguin, said "[e]xcuse me," pushed her left shoulder and "threw [her] down" on the sidewalk. Holguin suffered pain but did not require surgery and was taking pain medication more than one year later. The man got into the driver's side of the car and began to drive away, but not before Holguin grabbed her handbag from the passenger's car seat. The man drove off but stopped to pick up a woman waiting at the corner. Holguin described the driver as having messy, curly light-brown hair and a full light-colored beard and wearing black sweatpants and an orange short-sleeved T-shirt. Police, firemen and an ambulance responded to Holguin's son's call for help, but she refused to go to the hospital.

### The In-field Show-up Identification of Chavez-Estrella

Two days later the police called Holguin and advised: the Saab was found; it was at an International Boulevard gas station; and she could retrieve it. At the gas station, the police asked Holguin to view a suspect. She viewed the man from the backseat of a police car at a distance of about 45 feet, but had a clear,

2

unobstructed view. He was handcuffed and surrounded by three uniformed police officers and three police cars. The police told her that the man had been driving her car in traffic. Holguin said that the man was the person who shoved her and took the Saab. Police released the car to Holguin and her daughter, Mayra Holguin (Mayra).[1]

**Detention and Arrest of Chavez-Estrella**

An Oakland police officer was working plainclothes surveillance on July 25, 2018, and saw a man in the Elmhurst area he believed to be Eric Salazar (Salazar), who had an active warrant. Elmhurst was known as a locale for abandoned, stolen cars . The officer knew Salazar whom he had seen in Elmhurst and arrested for, among other crimes, driving a stolen vehicle. The man, who fit the description of Salazar, was "going in and out of [a] car." The officer radioed members of his surveillance team that he had seen Salazar and that he had an active warrant. Within 15 minutes his "squadmates" detained the man the officer identified. The officer drove by the detention site, confirmed that the detained person was the man he had identified as Salazar but, after driving by a second time, realized he was not Salazar.

The arresting officer testified that he and his partner, who were in full uniform in a marked car, received the radio direction to detain Salazar. They did a record check to confirm that Salazar was a parolee at large with an active warrant and detained him

_____

[1] We refer to Mayra by her first name to avoid confusion, not out of disrespect.

in the car at a gas station. The officer identified Chavez-Estrella as the man he detained, cuffed, and placed in the rear of the patrol car. About five minutes after the detention, the arresting officer compared the detained man with Salazar's booking photo and determined that he was not Salazar. Chavez-Estrella provided his name and date of birth; the officer ran a record check and learned that Chavez-Estrella was on active probation and subject to search. About five minutes later, the officer learned from the computer database, based on the car's VIN, that "it was a reported carjacking vehicle out of Berkeley." Next the arresting officer performed "a full search incident to arrest" and "recovered a car key and a cell phone and just personal property" from Chavez-Estrella; the Saab key was in his front right pants pocket. The Berkeley Police Department was advised of the detention, and within an hour Berkeley officers arrived and conducted an in-field identification.

A Berkeley officer went to the gas station where Chavez-Estrella, whom he identified in court, was detained. The officer called Holguin but, because she did not speak English, spoke to Mayra and told her they located Holguin's car. Mayra and Holguin went to the gas station to retrieve the car, and—since they were on scene—the officer conducted an in-field show up. Chavez-Estrella was standing in the gas station parking lot. Holguin saw him and said "si, si," which the officer understood as "yes, yes."

At the time of his arrest, Chavez-Estrella had the Saab key in his pocket. The car's front license plate was missing, and the

rear was turned backwards and covered with a paper license plate. The VIN matched that of the carjacked vehicle as did the actual license plate.

The Saab and key were returned to Holguin and Mayra.

Chavez-Estrella was arrested and charged with carjacking (count 1; Pen. Code, § 215, subd. (a)).

**In-court Identification of Chavez-Estrella**

At the preliminary hearing, Holguin identified Chavez-Estrella as the man who pushed her and took her car. The People did not elicit testimony about the in-field show up, but the defense cross-examined her about her identification of Chavez-Estrella. She said that the person the police presented was the man who took her car. On redirect, Holguin testified that she recognized Chavez-Estrella as the man who took her car, not "because he was caught with [her] car.

Chavez-Estrella was charged in an amended information with carjacking (count 1; Pen. Code, § 215, subd. (a)) and unlawful driving or taking of a vehicle (count 2; Veh. Code, § 10851, subd. (a)). The information also alleged that he committed the offenses while on felony probation (§ 1203, subd. (k)) and that he suffered one strike prior (§§ 1170.12, subd. (c)(1); 667 subds. (a), (e)) and two prison priors (§ 667.5, subd. (b). The People's motion to dismiss count 2 was granted.

**Motions to Suppress and to Exclude Identifications**

At trial on September 17, 2019, Chavez-Estrella moved pursuant to Penal Code[2] section 1538.5 to suppress the Saab key, cell phone, observations and resulting identification of him and his statements as the fruits of a warrantless search. He argued that the detention was without reasonable suspicion and unduly prolonged; his warrantless arrest was without probable cause; and the probation/parole search was unconsented and overbroad. He contended that any derived evidence must be excluded. The court heard the testimony of the Oakland and Berkeley officers and denied the motion.

Chavez-Estrella also moved to "exclude the in- and out-of-court identification"—both the "in-field show up on July 25, 2018," and the "subsequent identification of Mr. Chavez Estrella, in court during the preliminary hearing," which he argued "was tainted by the initial in-field show up." The court considered the testimony of the Oakland and Berkeley officers who conducted the show-up and denied the motion. [3]

**Unavailability of Maria Holguin**

On Thursday, September 19, 2019, during jury selection—but out of the presence of the venire—the People advised the court and counsel that Holguin reported to the courthouse that

---

[2] All statutory references are to the Penal Code unless otherwise indicated.

[3] Appellant also moved to exclude admission of his post-arrest statements as involuntary and obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436. The court denied the motion, but appellant does not challenge that ruling on appeal.

morning, in response to their subpoena, but en route to the restroom, she "[f]ell down the stairs and most likely broke her hip." The court said, "[S]he's at the hospital now, and the D.A. is waiting to see her prognosis. It's possible or likely she won't be available in the next say two weeks. So there's a possibility there will be a continuance, which I would grant."

The court asked if the defense would object to a continuance to Monday, September 23 to await Holguin's prognosis. Defense counsel replied, "I wouldn't object to continuing. I would ask to finish selecting the alternates, swear the jury, and then I would not object at that point to a continuance until Monday." The People objected to swearing the jury, and the court agreed with the People. Jury selection continued, and the prospective jurors were ordered to return on September 23, 2019.

On Monday, September 23, 2019, the People filed a motion pursuant to Evidence Code section 240, subdivision (a)(3) asking the court to find Holguin unavailable due to infirmity and to admit her preliminary hearing testimony. The People updated the court and counsel with information from Mayra that Holguin had surgery on Friday, September 20 and, as of Sunday, September 22, "was in the hospital recovering from her hip surgery" and "heavily medicated with morphine." The People argued: "She was heavily medicated and in pain. Moving her out of the hospital to testify at this point, would inflict substantial trauma on her and could ruin her ability to recover from surgery.

7

As such the People request the court find Ms. Holguin unavailable."

Chavez-Estrella objected to finding Holguin unavailable: "the foundation hasn't been laid and the unavailability has not been properly established. I believe the use of the prior preliminary hearing transcript would violate Mr. Chavez's state and federal constitutional rights to confrontation."[4] Chavez-Estrella elaborated that at the preliminary hearing, counsel "was prevented by the judge from asking about possible signs of mental illness when I was cross-examining Miss Holguin because the (*sic*) just stated that carjacking is a general intent crime, and for that reason shut down questioning that was geared towards a potential defense of intent, which is about mental illness. [¶] I do think that my cross-examining was limited in an area where it properly should have been allowed."[5]

In response to the court's question, the assistant district attorney said, "[T]he information I received from Mayra Holguin, Miss Holguin's daughter. She was in surgery on Friday evening, and . . . as of Sunday Miss Holguin is still in the hospital medicated and recovering from hip surgery. Her hip was in fact broken. At this time I don't think she's been discharged. But even if she's been discharged from the hospital, she was going to be moved to an inpatient rehabilitation center." The parties

---

[4] The record does not reflect a written opposition by appellant.

[5] Appellant's seventh motion in limine sought to "[e]xclude evidence of complaining witness'[s] state of mind" as "irrelevant but also normally inadmissible under Evidence Code section 352."

submitted, and the court said, "I'm making a finding of unavailability."

There is no record in the reporter's transcript that Chavez-Estrella responded to the court's September 19, 2019 statement that it would grant a continuance to allow Holguin to recover, nor did Chavez-Estrella move for a continuance. Instead, he proposed that the jury be instructed: "I think the best thing to do is to tell them the Court has ruled she is not available to testify, and you're instructed not to speculate on the reason for that." The court replied, "That's what I'm going to do."

The prospective jurors returned to the courtroom and were sworn. The court advised them: "The complaining witness in this case is not going to be able to testify, but there is a recorded transcript from the preliminary hearing. This is the instruction you'll have as to her not being available. The testimony that Maria Holguin has given under oath will be read to you because she's not available. You must evaluate this testimony by the same standards that you apply to a witness who testifies here in court."

**Holguin's Testimony**

After the court found Holguin unavailable the court conducted a hearing on the portions of Holguin's preliminary hearing testimony which would be read to the jury. Chavez-Estrella objected to, and the court excluded, certain lines of Holguin's testimony. Chavez-Estrella restated the objection to the testimony being read.

At trial, the People introduced Holguin's preliminary hearing testimony in which she described the carjacking, and—in the courtroom—identified Chavez-Estrella as the person who took her car. She testified that the in-court identification was not the result of the in-field show up.

Holguin described the events before and during the carjacking. She finished cleaning the office with her son and was waiting for him on the sidewalk, next to the passenger side of her car, which was parked in the street. The key was in the ignition and the motor was running. Chavez-Estrella was with a woman, approached her, said, "Excuse me," and pushed her left shoulder, throwing her on the sidewalk. Chavez-Estrella got into the driver's side, and drove off, but not before Holguin grabbed her handbag from the car's passenger seat. He drove straight ahead, stopping at the corner for the woman who got into the car through the front passenger door. The police returned her car two days later.

On cross-examination, Holguin described Chavez-Estrella as having a full brown beard and curly brown hair, and—when she saw him two days later—she identified Chavez-Estrella because she recognized him as the person who took her car.

**The Surveillance Footage**

The People introduced and the court admitted a surveillance video. The video depicts a woman identified as Holguin in front of the Central Self Storage. (Exhibit 2, at 3:08:44 p.m. on July 23, 2018.) She is accompanied by a young man, and they are taking cleaning supplies into the building. (Exhibit 2.)

Holguin exits the building with a vacuum cleaner and exits the lower left corner of the frame. (Exhibit 2 at 3:09:27 to 3:09:53 p.m.) A man and woman enter the center lower frame and walk forward. (Exhibit 2 at 3:13:12 p.m.) The man looks in the direction in which Holguin departed and then turns and exits the lower left frame. (Exhibit 2 at 3:13:17 to 3:13:22 p.m.) The woman continues walking toward the corner where she waits. (Exhibit 2 at 3:13:33 p.m.) The Saab enters the left frame, and the woman walks toward the Saab. (Exhibit 2 at 3:13:34 p.m.) Simultaneously, Holguin reenters the frame from the lower left and walks up the sidewalk toward the woman. (Exhibit 2 at 3:13:36 p.m.) The Saab slows down—without stopping—allows the same woman to enter the passenger side and then rounds the corner and speeds away (Exhibit 2 at 3:13:36 to 3:13:40 p.m.) At the same time Holguin is walking toward the corner with a handbag on her left arm. She reaches the corner and waves with her right hand in the direction that the Saab departed. (Exhibit 2 at 3:13:53 p.m.) Holguin rounds the corner (Exhibit 2 at 3:13:58 p.m.), and the three-minute, 34-second surveillance video ends.

**CALCRIM No. 315**

The court conducted a jury instruction conference off the record and then memorialized objections on the record. In response to the court's statement that it was going to instruct using CALCRIM No. 315 (Eyewitness Testimony), the defense objected to some aspects of the instruction but did not object to the instruction or specifically to the question: "How certain was the witness when he or she made the identification?" (Eyewitness

11

certainty question.) The court instructed using CALCRIM No. 315 and included the eyewitness certainty question.

**The Verdict and Sentence**

The jury deliberated and reached a unanimous verdict on September 27, finding Chavez-Estrella guilty of carjacking in violation of section 215, subdivision (a). In the second part of the bifurcated trial, the court found "all the priors to be true."

At sentencing, the court denied the *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529–530), but exercised its "discretion to strike both the one-year prior pursuant to section 667.5[, subdivision] (b) due to the defendant's difficult upbringing and all the other factors listed in the letter by the public defender." The court sentenced Chavez-Estrella to the aggravated base term of nine years, which was doubled due to the prior strike and an additional five-year term pursuant to sections 667, subdivision (a)(1) and 667, subdivision (c), for a total of 23 years in state prison.

## DISCUSSION

**1.     The court did not err in finding Holguin unavailable and admitting her preliminary hearing testimony.**

At the hearing on the People's motion to find Holguin unavailable, Chavez-Estrella argued that the foundation was inadequate and that admitting her preliminary hearing testimony would violate his constitutional confrontation rights. The court rejected these claims, and we agree.

Chavez-Estrella's first objection—lack of "foundation"—did not inform the court, nor does it enlighten us, as to the alleged deficiency. In his brief Chavez-Estrella seeks to remedy that

failure and to reframe the "foundation" objection as: (1) hearsay, arguing the assistant district attorney related evidence from Mayra; and (2) calls for an expert opinion (Evid. Code, §§ 800; 801). Chavez-Estrella's second objection was that admitting Holguin's preliminary hearing testimony violated his right to cross-examine the victim.

**Legal Principles**

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*).)

Evidence Code section 1291 provides, in pertinent part, as follows: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: ¶ : . .¶ (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).) Evidence Code section 240, in turn, defines the phrase "unavailable as a witness." Relevant to this case, a witness may be found to be unavailable when he or she is "[d]ead or unable to attend or to testify at the hearing because of then-

13

existing physical or mental illness or infirmity." (Evid. Code, § 240, subd. (a)(3).)

The witness's infirmity must be sufficiently severe to make appearance at trial "relatively impossible." (*People v. Winslow* (2004) 123 Cal.App.4th 464, 471 (*Winslow*).) To satisfy Evidence Code section 240, subdivision (a)(3), "the illness or infirmity must be of comparative severity; it must exist to such a degree as to render the witness's attendance, or his testifying, relatively impossible and not merely inconvenient." (*People v. Gomez* (1972) 26 Cal.App.3d 225, 230 (*Gomez*).)

Chavez-Estrella's challenge to Holguin's testimony requires us to review both the question of fact—whether the People established by preponderance of evidence that Holguin's hip surgery, pain medication and incapacity rendered her unavailable—and the question of law, whether under the circumstances Chavez-Estrella's right to confront the victim was violated.

"The standards of review for questions of pure fact and pure law are well developed and settled. . . . [A]n appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law), but it reviews determinations of law under a nondeferential standard, which is independent or de novo review." (*Cromer, supra,* 24 Cal.4th at pp. 893–894.) "Selecting the proper standard of appellate review becomes more difficult when the trial court determination under review resolves a mixed question of law and fact. Mixed questions are those in which the

14

' "historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ' " (*Cromer*, at p. 894 [ appellate court independently reviews trial court's finding the prosecution used due diligence to locate missing witness.]; see *Winslow*, *supra*, 123 Cal.App.4th at p. 471 [applies *Cromer* where witness's unavailability results from "existing mental illness or infirmity"]; (Evid. Code, § 240, subds. (a)(3), (c))].)

The showing required to establish a witness's unavailability is left to the discretion of the trial court. (*People v. Alcala* (1992) 4 Cal.4th 742, 779; *People v. Rojas* (1975) 15 Cal.3d 540, 550–551; see *Gomez*, *supra*, 26 Cal.App.3d at p. 230 ["we cannot say just what illness or infirmity must be shown or the degree of its severity, leaving that determination to a trial court's exercise of discretion"].)

We independently review the trial court's determination that Holguin was unavailable and that her preliminary hearing testimony be admitted. (*Cromer*, *supra*, 24 Cal.4th at p. 901 [de novo review of trial court's determination prosecutor exercised due diligence in locating missing witness]; *Winslow, supra*, 124 Cal.App.4th at p. 471 [independent review of trial court's finding witness unavailable due to mental illness or infirmity].)

15

**Analysis**

**The Evidentiary Objections**

If, as Chavez-Estrella now argues, the objection to the assistant district attorney's representations was "hearsay," it was forfeited. To preserve an objection for appeal, it must be "timely made" and "stated as to make clear the specific ground of the objection." (Evid. Code, § 353, subd. (a).) "To obtain reversal based on the erroneous admission of evidence, the record must show a timely objection making clear that specific ground. [Citations.] Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission." (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726.)

Had the objection been preserved, "[w]e review the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)" (*Winslow, supra*, 123 Cal.App.4th at p. 467.) On this record we would conclude that the court did not abuse its discretion in relying on the assistant district attorney's statements that Holguin had hip surgery to repair the injury she sustained at the courthouse and that her pain medication and hospitalization precluded her attendance at court. A court may consider representations from an officer of the court without formal testimony. (*People v. Medina* (1995) 11 Cal.4th 694, 731. ["The prosecutor was an officer of the court whose

16

representations of fact, made without objection or rebuttal by defendant, properly could sustain the court's ruling"].)

Nor did the amorphous "foundation" objection preserve an objection to the assistant district attorney's competence. [6] That objection, too, was forfeited. (Evid. Code, § 353, subd. (a).) Had the objection not been forfeited we would apply the "deferential standard" and would find no error. The prosecutor was not rendering an expert opinion; she was relating a historical fact. On September 19, she advised the court and defense counsel of Holguin's injury, and on September 23, she reported that Holguin had hip surgery, was medicated for the pain and was hospitalized. The assistant district attorney was competent to relate the information received from Mayra. (Evid. Code, § 702.) She was not expressing an opinion (Evid. Code, § 800), let alone one which would require her to qualify as an expert (Evid. Code, § 801).

---

[6] Chavez-Estrella argue that we should follow *People v. Green* (1963) 215 Cal.App.2d 169 . Even if *Green* is still good law, we would not reach a different conclusion. In *Green* the trial court allowed the prosecutor to make an unsworn statement about the unavailability of the out-of-state complaining witness and admitted, without authentication, a letter and two telegrams between the prosecutor's office and the witness to prove the witness was unavailable. (*Id.* at pp. 170–171.) Green's attorney "object[ed] upon detailed and sound grounds," including hearsay, to the admission of the correspondence. (*Ibid.*) The court overruled the objections and admitted the witness's preliminary hearing testimony. On that record, the court held admitting the witness's testimony was reversible error. (*Id.* at pp. 170–171.) There were no such objections here.

**Holguin's Unavailability**

In conducting our "first inquiry" under *Cromer*, "[w]e review the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment." (*Winslow*, *supra*, 123 Cal.App.4th at p. 467.) The court did not abuse its discretion in relying on the assistant district attorney's representation that Holguin had hip surgery and that her pain medication and hospitalization precluded her attendance at court. We find no error in the trial court's admission of the evidence that Holguin broke her hip, was hospitalized and was taking pain medicine.

**Admitting Holguin's testimony**

For the second inquiry, we "independently review" the trial court's decision finding Holguin unavailable as required by Evidence Code section 240, subdivisions (a)(3), (c), and admitting her preliminary hearing testimony pursuant to Evidence Code 1291, subdivision (a)(2). (*Cromer*, *supra*, 24 Cal.4th at p. 901.)

Our analysis begins on September 19 when—upon learning of Holguin's fall—the trial court anticipated the possibility that she might be unavailable for about two weeks to testify at trial and sua sponte stated its willingness to grant a continuance. The parties had not concluded jury selection, but Chavez-Estrella did not respond to the court's invitation for a two-week continuance. Since the court previously granted the defense request to be dark on Friday, the court proposed that the jurors return on Monday, September 23. The defense objected unless the jurors were sworn,

but the court instructed the venire to return the next week. On Monday, upon learning of Holguin's surgery and hospitalization, Chavez-Estrella objected to admitting the testimony, but did not request a continuance, and the jury was sworn. Chavez-Estrella did not accept the court's proposal of a continuance to allow the victim to recover and to testify. Having made that strategic decision, he cannot now avoid its consequences. (*Yakus v. United States* (1944) 321 U.S. 414, 444 "[a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it"].)

In any event, our independent review of the record inescapably leads to the conclusion that the nature and severity of Holguin's hip injury and surgery would have made live testimony at trial "relatively impossible" (*Winslow*, *supra*, 123 Cal.App.4th at p. 471) and that her disability was "to such a degree as to render [her] attendance, or [her] testifying, relatively impossible and not merely inconvenient." (*Gomez*, *supra*, 26 Cal.App.3d 225, 230)."

To the extent that Chavez-Estrella contends his cross-examination was inadequate, we also find that the trial court satisfied Evidence Code section 1291, subdivision (a)(2).[7] The People's relatively brief direct examination of Holguin—

---

[7] "The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a)(2).)

consuming 10 transcript pages—elicited the basic elements of the carjacking and did not include any questions about the in-field identification. In contrast, Chavez-Estrella conducted a lengthy cross-examination—consuming 25 transcript pages—probing every aspect of the carjacking, Holguin's ability to perceive the events and her attacker, and the circumstances of the in-field and in-court identifications.

Chavez-Estrella attempts unsuccessfully to analogize the record to that in *People v. Stritzinger* (1983) 34 Cal.3d 505, 515 where—based only on her mother's opinion—the trial court found a child molestation victim unavailable and admitted her preliminary hearing testimony. (*Id.* at p. 510.) Although Stritzinger was given the opportunity to question the victim, his counsel did not do so at the preliminary hearing. (*Id.* at pp. 515–516.) The trial court made the finding of unavailability based solely on the victim's mother's testimony about the child's emotional difficulties. (*Ibid.*) The Court of Appeal reversed, holding that the "mother's testimony on the issue of her daughter's mental health is legally insufficient to support a finding of witness unavailability." (*Id.* at p. 516.) The court concluded that "medical testimony" is not "a specific requirement for a finding of unavailability under the 'mental illness or infirmity' provision of Evidence Code section 240," but "[t]he mother's understandably protective testimony was . . . insufficient as a matter of law for this critical purpose." (*Id.* at p. 518.)

This case is different. The extent and severity of Holguin's infirmity are undisputed. Chavez-Estrella "was given and had the right and opportunity to cross-examine" Holguin "with an interest and motive similar to that which he ha[d]" at trial. (Evid. Code, § 1291, subd. (a)(2).) Unlike *Stritzinger*, Chavez-Estrella exercised that right. His counsel conducted a thorough, penetrating cross-examination of Holguin at the preliminary hearing. Having conducted a de novo review, we conclude the court did not err in finding Holguin unavailable to testify at trial and admitting her preliminary hearing testimony.

### 2. Admitting Holguin's in-field identification of Chavez-Estrella did not violate his due process right.

Chavez-Estrella moved pretrial to exclude evidence of both the in-field show up identification and the in-court identification, arguing that the former was unduly suggestive and the latter was tainted by it. The court heard testimony and denied the motion.

**Legal Principles**

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the

21

identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989 (*Cunningham*).) "But as *Stovall* [*Stovall v. Denno* (1967) 388 U.S. 293] makes clear, the admission of evidence of a showup without more does not violate due process." (*Neil v. Biggers* (1972) 409 U.S. 188, 198 [rape victim's identification of suspect at a single-person identification seven months after the offense was not unduly suggestive].)

"We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.'" (*People v. Avila* (2009) 46 Cal.4th 680, 698–699.) "Defendant does bear the burden of demonstrating the identification procedure was unduly suggestive." (*People v. Avila*, at p. 700.)

**Background**

The Berkeley police officer who conducted the show-up received a call from an Oakland officer advising that the Saab and a potential suspect were at the 100 block of International Boulevard in Oakland. The Berkeley officer called Holguin but, because Holguin spoke only Spanish, told Mayra that the Saab was at a gas station at that location and that he would call her to arrange for her to retrieve it. Shortly after his arrival, Mayra approached him and said that she and Holguin had come to get the car. Because Holguin was present and the Oakland officer spoke Spanish, the Berkeley officer conducted an in-field show-up. He testified, "I didn't plan on doing it, but since the victim showed up, I decided to do it." He said that he had never conducted a show-up two days after a felony was committed. In

22

those circumstances, his practice is to conduct "a double blind lineup of the possible suspect."

**Analysis**

We independently review the evidence in light of the *Cunningham* factors, beginning with whether the procedure was "unduly suggestive." (*Cunningham*, *supra*, 25 Cal.4th 926, 989.) Upon arriving at the gas station to retrieve her recently recovered car, Holguin was asked to participate in the show-up. Sitting in the rear of the police car, Holguin viewed Chavez-Estrella, who was standing close to the Saab. On cross-examination Holguin replied "yes" to defense counsel's statements that the police told her: "that they had found the car"; "they told you that they wanted you to look at a person"; "that they thought had taken your car." Holguin testified that the officers told her "they caught him in traffic." She initially said that she thought Chavez-Estrella was the person who had taken her car "[b]ecause he had the car." We agree with Chavez-Estrella that, under the circumstances, the in-field investigation was "unduly suggestive."

Because we find "the identification itself was nevertheless reliable under the totality of the circumstances," we do not decide whether it was "necessary." (*Cunningham*, *supra*, 25 Cal.4th at p. 989.) Notwithstanding the brevity of the interaction, Holguin testified to her opportunity to view Chavez-Estrella and to her attention at the time of the offense. She saw his face when he took her car and as she grabbed her purse from its place on the passenger seat. Holguin testified that, based on her observation

23

at the time, she would be able to recognize Chavez-Estrella if she saw him again. Notwithstanding Chavez-Estrella's efforts to show that the in-field identification was tainted by the circumstances, when Holguin was asked: "So did you tell the police that you recognized him because when you saw him he looked like the person who took your car, or did you pick him because he was caught with your car?" She responded, "No, no, no, no. Because I recognized him."

Holguin's description of the events and of Chavez-Estrella's conduct was also remarkably accurate. Except for misdescribing Chavez-Estrella's shirt as orange—instead of white—Holguin's recitation of the carjacking was corroborated, minute-by-minute, by the video. Holguin described Chavez-Estrella's full beard and hair. She testified: The man who took the car was with a woman who waited for him at the corner. Immediately after taking the car, he picked her up and sped off. The video confirms every detail: Holguin departs the storage facility and walks (off screen) to her car. Four minutes later, a man and woman appear, and he turns in the direction of Holguin and her car. The woman continues walking to the corner, where she waits. Moments later the car speeds off, pauses to pick up the same woman, and then turns the corner and departs. As the car is fleeing, the video depicts Holguin, the car, and the woman all in close proximity.

The last *Cunningham* factor—the lapse of time between the offense and the identification—similarly supports finding her identification reliable. (*Cunningham, supra*, 25 Cal.4th at p. 989.) A mere two days after the incident, Holguin saw and identified

Chavez-Estrella. Having conducted an independent review and applied the *Cunningham* factors, we conclude that the in-field identification was reliable.

**Harmless Error**

Even if we concluded that the in-field identification was admitted in error, we would find the error to be harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see *Chavez*, *supra*, 22 Cal.App.5th at p. 675 [*Chapman* harmless error standard applies where due process rights are violated by unduly suggestive identification].) The evidence in support of the verdict was overwhelming. The jury heard Holguin's testimony and, presumably, believed her. She saw Chavez-Estrella when he pushed her down and when she pulled her purse from the passenger side. Her description of the offense is consistent with the video. The jury could also compare the video to Chavez-Estrella's booking photo, taken only two days after the carjacking. Viewing Chavez-Estrella in the courtroom, they could see the similarity between his distinctive build and the man in the video. The jurors heard evidence that Chavez-Estrella was apprehended driving the car within miles of the location of the offense, that the car's front license plate was missing, and the rear plate was turned backwards and covered with a paper license plate. When apprehended, Chavez-Estrella had the Saab key in his pocket.

In light of the abundant evidence of guilt, admitting the in-field identification was harmless. (*Chapman*, *supra*, 386 U.S. at p. 24; see *Chavez*, *supra*, 22 Cal.App.5th at p. 675; see also

*People v. Leon* (2015) 61 Cal.4th 569, 601 ["because the surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant."]

3. **Holguin's in-court identification was not tainted by the in-field show up, and admitting it was not error.**

Holguin also identified Chavez-Estrella at the preliminary hearing. She testified that during the carjacking, she was able to see Chavez-Estrella's face and that she would recognize him if she saw him again. In the courtroom Holguin identified Chavez-Estrella as the person who pushed her down and took her Saab. The factors which led us to conclude that the in-field identification was reliable compel the same result as to Holguin's identification at the preliminary hearing. Had application of the *Cunningham* factors led to the opposite conclusion, we would, for the reasons discussed above, again find any error to be harmless. (*Chapman, supra,* 386 U.S. at p. 24; see *Chavez, supra,* (2018) 22 Cal.App.5th at p. 675.)

4. **Chavez-Estrella forfeited any objection to the eyewitness certainty question in CALCRIM No. 315, and the question does not violate his due process rights.**

The court gave CALCRIM No. 315, eyewitness identification, in its entirety. Chavez-Estrella did not object to CALCRIM No. 315 but did make two requests: (1) "Specifically, there are some bracketed paragraphs that I wanted given. One is was the witness able to identify the defendant in a photographic or physical lineup"; (2) "There's also an option in 315 for a pin point factor. The way 315 is written, certain other relevant

26

factors raised by the evidence. I'm specifically requesting that the Court give one factor and that is something along the lines of was a suggestive identification procedure used." The court rejected both requests.

On appeal, Chavez-Estrella objects to the court's inclusion of the following element of CALCRIM No. 315: "How certain was the witness when he or she made an identification?" (Eyewitness certainty question.)

Having failed to object to the inclusion of the eyewitness certainty question in CALCRIM No. 315, Chavez-Estrella forfeited the argument, and the court had no duty to modify an otherwise correct instruction. (*People v. Kelly* (1992) 1 Cal.4th 495, 535; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)

In any event, after briefing was completed, the Supreme Court decided that including the eyewitness certainty question does not violate a defendant's due process rights. (*People v. Lemcke* (2021) 11 Cal.5th 644, 646–647 ["the instruction does not direct the jury that 'certainty equals accuracy' "].)

Chavez-Estrella forfeited any claimed error from inclusion of the eyewitness certainty question, and—had the objection been made and preserved—we would follow *Lemcke* and find no violation of his constitutional rights.

5.     **There was no error in denying the motion to suppress and admitting the evidence obtained from the search and seizure.**

Chavez-Estrella moved to suppress the evidence derived from the search and arrest contending that the prosecution failed

to meet its burden under *People v. Harvey* (1958) 156 Cal.App.2d 516 and *People v. Madden* (1970) 2 Cal.3d 1017 (*Madden*) to "trace the information received by the arresting officer back to its source and prove that the originating or transmitting officer had the prerequisite probable cause or reasonable suspicion to justify the arrest or detention." (*In re Eskiel S.* (1993) 15 Cal.App.4th 1638, 1643.) He also claims his detention and arrest based on mistaken identity was not reasonable. The court took testimony and denied the motion on all grounds asserted.

**Legal Principles**

" 'A defendant may move to suppress evidence on the ground that "[t]he search or seizure without a warrant was unreasonable." (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.] 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' ' " (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.)

**Analysis**

Chavez-Estrella was detained because the Oakland officer believed him to be Salazar, who had an outstanding arrest warrant, and informed the surveillance team to detain him to arrest Salazar. "It is well settled that while it may be perfectly

28

reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' " (*Remers v. Superior Court* (1970) 2 Cal.3d 659, 666.)

To meet that burden the People introduced evidence of the validity of the arrest warrant for Salazar. The Oakland officer knew the warrant was valid, and arresting officer Perry confirmed it in the CRIMS database before detaining Chavez-Estrella, whom he understood to be Salazar. The Oakland officer had arrested Salazar in the area for possession of stolen vehicle and radioed the arresting officer, who relied on that information to detain Chavez-Estrella. Having confirmed that Salazar was a parolee at large with an active warrant, the arresting officer cuffed and detained Chavez-Estrella in the rear of the patrol car. After comparing Chavez-Estrella with Salazar's photo and learning Chavez-Estrella's identity, the officer ran a record check, which revealed that Chavez-Estrella was on active probation and subject to search. Within minutes the officer also learned from the computer database that the Saab was the subject of a reported carjacking out of Berkeley. Knowing of the search condition and the report that the Saab had been stolen, the officer searched Chavez-Estrella and retrieved the Saab key from Chavez-Estrella's front right pocket.

The arresting officer's detention of Chavez-Estrella was reasonable based on the valid arrest warrant for Salazar and the

information he received from the Oakland officer. "An officer may arrest or detain a suspect 'based on information received through "official channels." ' " (*Madden*, *supra*, 2 Cal.3d 1017, 1021 and cases cited; *People v. Brown* (2015) 61 Cal.4th 968, 983.)

It was reasonable for the Oakland officer who knew Salazar and knew that Salazar had an outstanding warrant to advise the arresting officer. And it was reasonable for the arresting officer to rely on that information and—after confirming that the warrant was active—to detain Chavez-Estrella. Upon learning that Chavez-Estrella was not Salazar—but that Chavez-Estrella was on probation with a search condition and that he was driving a car whose VIN had been reported as the subject of a carjacking— it was reasonable for the officer to detain and then to arrest Chavez-Estrella. The search of Chavez-Estrella was justified both by his active search condition and incident to his arrest for driving a reported-stolen vehicle. (*People v. Brendlin* (2008) 45 Cal.4th 262, 267; *People v. Durant* (2012) 205 Cal.App.4th 57.) Having independently reviewed the record, we find that the court's ruling was supported by substantial evidence and that the court did not err in denying the motion to suppress and admitting the evidence at trial.

**6.    There was no cumulative error.**

We analyzed the record and, where appropriate, conducted an independent review and find no error.

7.    **The court did not abuse its discretion in denying the *Romero* motion.**

Chavez-Estrella contends that the court denied his *Romero* motion (*Romero*, *supra*, 13 Cal.4th at pp. 529–530) without

considering that he was 18 years old when he committed the second-degree robbery strike and only 24 when he committed the carjacking. We disagree.

**Legal Principles**

We review the ruling under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376–377.)

**Analysis**

At sentencing, the court selected "the aggravated term of nine years [as] . . . the base term" having found the following aggravating factors: "[T]he defendant engaged in violent conduct which indicates a serious danger to society. The defendant's prior convictions as an adult are numerous and are of increasing

seriousness. The defendant has served three prior prison terms. The defendant was on felony probation when the crime was committed. The defendant's prior performance on probation and post-release community supervision was unsatisfactory. [¶] There are no circumstances in mitigation."

The court declined to exercise its discretion under section 1385 to strike the strike prior but exercised its "discretion to strike both one-year priors pursuant to section 667.5[, subdivision] (b) due to the defendant's difficult upbringing and all the other factors listed in the letter by the public defender."

Applying the deferential standard to the record, we conclude that denying the *Romero* motion was not irrational or arbitrary. The court recognized that Chavez-Estrella was young when he committed the carjacking and the prior strike robbery, but found his criminal history outweighed that consideration. Chavez-Estrella was convicted of the following offenses in Alameda County: second degree robbery (§ 211) in April 2012 and served a prison term; unlawful taking of a vehicle (Veh. Code, § 210851, subd. (a)) in September 2014; assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)) in January 2018; and receiving stolen property, motor vehicle (§ 496d, subd. (a)) in October 2016. Chavez-Estrella was on both probation and post-release community supervision at the time he committed the carjacking. We find the court did not err in denying the *Romero* motion.

## 1. Resentencing

As noted on pages 1–2, *ante*, the Supreme Court granted review and ordered this court to vacate our decision and to reconsider the cause in light of Senate Bill 567 and Assembly Bill 124, two recent legislative enactments that bear upon sentencing discretion. We have done so.

Senate Bill 567 creates a presumption that the chosen term shall not exceed the middle term unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation, (2) proven to the trier of fact beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3(c)), adding § 1170, subd. (b)(1)–(b)(3), by amendment.)[8] Senate Bill 567 also creates a presumptive mandate for the low term where the defendant's psychological, physical, or childhood trauma was a contributing factor in the commission of the offense. (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding § 1170, subd. (b), by amendment.) In those circumstances, section 1170, subdivision (b)(6)(A) thus dictates choice of the low term "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [so] that imposition of the lower term would be

---

[8] Assembly Bill 124 proposed similar but not identical amendments to section 1170 and was also signed by the Governor in 2021. (See Stats. 2021, ch. 695, § 5, effective Jan. 1, 2022.) However, because Senate Bill 567 was the last bill signed by the Governor and bears the higher chapter number, its amendments to section 1170 prevail over those specified in Assembly Bill 124. (Gov. Code, §9605, subd.(b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.)

contrary to the interests of justice." In any case, the court is required to "set forth on the record the facts and reasons for choosing the sentence imposed." (§ 1170, subd. (b)(5).)

Chavez-Estrella asserts, correctly, that the amendments qualify as ameliorative changes to the sentencing laws and therefore apply to any judgment that, like his, was not final on the new legislation's operative date. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 306–308; *People v. Frahs* (2020) 9 Cal.5th 618, 624–625; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) The People concede the amendments are applicable to Chavez-Estrella's case and that the proper remedy is remand to the trial court for resentencing. We agree, and therefore shall remand for the court to reconsider Chavez-Estrella's sentence in light of the new provisions. (See *People v. Frahs,* at pp. 637–641 [remand for trial court to consider eligibility for mental health diversion under new statutory program]; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

## DISPOSITION

The sentence is vacated. On remand the trial court shall impose a new sentence in accordance with newly enacted section 1170, subdivisions (b)(1)-(b)(3) and (b)(6). In all other respects the judgment is affirmed.

34

_____
Ross, J.*


WE CONCUR:


_____
Pollak, P.J.


_____
Streeter, J.


*A158809 People v. Chavez-Estrella*

---

* Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.